M. WEBB Good morning. Our first case this morning is Sinclair-Allison v. Fifth Ave. of Physician. Mr. Webb. M. WEBB Good morning, Your Honors. It pleases the Court, my name is Nathan Webb. I'm here on behalf of the appellate Sinclair-Allison. I'd like to reserve a few minutes for a vote, please. This case presents the Court with an opportunity to further clarify the proper application of a Section 101 patent eligibility analysis to claim... M. WEBB Further clarify. Have we clarified it up to now? M. WEBB Well, Your Honor, I think the picture is perhaps a bit more clear than it was when we began briefing in this case. M. WEBB Okay. M. WEBB Today I hope to persuade you that the district court erred in concluding that the relevant claims were merely unpatentable abstract ideas. I know that the Court has carefully reviewed the briefs and is familiar with the facts and case authority cited within. So what I'd like to do today is take on directly the two cases that are primarily relied upon by Fifth Avenue in their assertion that the claims captured... a mere algorithm. So what did you provide that's something more tangible and specific and targeted to inventive activity? M. WEBB Well, Your Honor, I think that your decision in Ultramershal is illustrative of the type of additional steps that can move a patent claim that contains an abstract idea into a sufficiently particular application of that idea. And in Ultramershal, what you said was in essence that we have something more than merely mental steps in this case. In CyberSource, they looked at the claims... M. WEBB There's no particular hardware here, though. I mean, the specification says in column 5 of the 571 patent, the required computer hardware and necessary computer code would be obvious to one skilled in the art. Sort of a generic computer and computer code, right? M. WEBB Well, Your Honor, I guess I don't agree on that point. For one thing, in 1999, the drafting of this patent could reasonably rely on the well-worn legal principle... M. WEBB What is that language that I read you mean? M. WEBB Well, what that's referenced to is existing technologies. And what we know, even in... M. WEBB By the way, the electronic part of this is going to be done using existing technologies. M. WEBB I believe that that's accurate, and I believe the specification references the baseline technologies against which our claims must be construed. And I think it's important that we recognize that a new combination of existing technologies is patented. M. WEBB So, if I could just take inventory of where we've come since briefing closed in this case... M. WEBB What you, following up on what Judge Dyke said, if what you're doing is just known and conventional, you haven't really given us that something more, have you? M. WEBB Well, the something more here, I think, are the human interaction steps, Your Honor. M. WEBB And I think, also, at this juncture in the case... M. WEBB Human interaction steps. Help me. What do you mean by that? M. WEBB Yeah, let's look at Claim 1 in Patent 571. And, again, an old commercial, Chief Judge Greger, I think you aptly observed that we're not really talking about an intangible, abstract idea. We're talking about human interaction, things that people do. Are those really so disembodied from the physical world as to be an unpatentable, abstract idea? Let's look at Claim 1. And this is just one example of the type of limitations that we've included, I think, amount to the something more. This claim requires that you deliver a medical malpractice insurance policy, or application, rather, to the physician for the physician's review and approval. Just as an old commercial, that is a human interaction that can't be performed purely in the mind and requires interaction between a physician who has delivered a particular and specific item. They review it and then give their approval to that application. M. WEBB How is that different from what would have happened before you wrote these claims? M. WEBB Well, Your Honor, at this juncture in the case, you have to accept all of our well-fled factual allegations as true and view the facts in the light most favorable to us. As you recall, this case was dismissed on a 12 v. 6 motion to dismiss. And both the complaint and the patent both say that there was no known correlation between information in the credentialing application and that in the medical malpractice insurance application. So this was not conventional. This was not routine or well understood. I think that that is the genuine contradiction. M. WEBB To me, it wasn't conventional. I mean, the process of transferring information from a credentialing organization to a malpractice insurer was certainly conventional, wasn't it? M. WEBB Your Honor, the patent says that that process that you just described was not being practiced at the time the application was filed, and there's no evidence in this record to rebut that point. By the way, why are we looking at Claim 1? Isn't 2 the broadest one? M. WEBB 2 is the broadest, and Your Honor, there are limitations in Claim 2 that I think similarly require precisely the type of interview and interaction that you discussed in Old Commercial. In Claim 2, you have to obtain the health care provider's permission for release of credentialing information into a medical malpractice insurance. M. WEBB And that would have not happened before. M. WEBB That's precisely true, Your Honor. There's no evidence to suggest that that had ever occurred prior to the filing of the application. M. WEBB Well, the patent itself describes that happening in the prior art. M. WEBB Your Honor, that isn't entirely accurate. What the background of the art section referenced was the sharing of credentialing information between government entities. There was a program called the Federal Credentialing Program that had an electronic database that contained credentialing information. It's true that there were existing technologies that shared that information with other government agencies, but it was not known to take information in a credentialing application and electronically transfer it into a medical malpractice insurance application. Was it known to take credentialing information and non-electronically transfer it to a medical malpractice insurance? M. WEBB There's no evidence of that, Your Honor. Again, it may be, and I think this is an important point in this case, which is that we had no fact discovery or formal claim construction in this case. Your Honor, it might be that in the course of fact discovery, we would have found out that this wasn't perhaps as unconventional or unknown as was stated in the patent. But at this procedural juncture, you have to accept as true the statements in the complaint and the patent, again, unrebutted here, that it was not known. And I think that we've… J. R. R. Martin Insurance companies routinely require credentialing information in order to write malpractice policies, no? M. WEBB Your Honor, I think that that's a different question. Your question, I think… J. R. R. Martin Is what I say true? M. WEBB It's true, Your Honor, that in completing a medical malpractice insurance application, some of the information that they require might also be contained in a credentialing application. It's not true that there was any evidence that information in a credentialing application was being transferred either manually or electronically into a credentialing application, particularly in a fashion that was in any way similar to the claims as they issued into a patent. J. R. R. Martin But this information was being transferred to insurance companies that were writing policies. They couldn't very well have written the policies without the information, right? M. WEBB Your Honor, that's true. I think that that really is the inventive concept that we have in this case, which is that prior to the filing of our application, physicians had to fill out two applications in order to get credentialed and to get medical malpractice insurance. So they had to fill out one application with all the information that was required to provide an insurance quote, and they had to fill out a separate application to get credentialed. And those two processes were not linked. And that's the title of our invention. I think that's what was actually novel here. And, Your Honor, I think the old commercial is really, again, Max was taking inventory of where we're at. J. R. R. Martin How did it get around Bilski? J. R. R. Martin We had arguments about the novelty of the hedging system in that particular instance and that one might characterize as supplying more information than you have as to something unique being done. M. WEBB Well, Your Honor, in Bilski, we had the benefit of fact discovery and formal claim construction, and we don't here. So I would confess that we are handcuffed a bit in fully elaborating on why I think we need the machine test. J. R. R. Martin What's the machine test? M. WEBB Well, the machine test, Your Honor, is one of the factors that we have to… J. R. R. Martin There was a machine in Bilski, too. M. WEBB That's true. I think, Your Honor, that what we've learned from Prometheus is that we can't look to a particular… J. R. R. Martin You learned something from Prometheus? Please tell us what you learned. M. WEBB Well, Your Honor, there's a three-factor test that we have to apply. We have to ask ourselves, did we disclose and claim a sufficiently particular and practical application of the abstract idea? Do we too broadly preempt that abstract idea? And finally, is there an inventive concept? And I think that, you know, Bilski was sort of the first step where the Supreme Court said, no, the machine test isn't the only test. I think, for me, this is the follow-up where they say, here are these other considerations. And we know from CLS that at least five of the judges, in what I would have to characterize as the majority opinion, believe that… J. R. R. Martin What's the majority opinion? M. WEBB Well, there was a five-judge opinion, Your Honor, written by Judge Gloria. I would agree that it's non-presidential. J. R. R. Martin I don't think the Chief Judge would like to refer to that. J. R. R. Martin There is no majority opinion. It's true that it's not presidential, Your Honor, but we know that at least five judges believe that the Section 101 preemption analysis or analysis has to turn on preemption. And that's not an issue that is strong for Fifth Avenue in this case. And you need look no further to even the scarce record that we have before us to understand that under ultra-martial, we do not preempt all practical applications of the abstract idea. Fifth Avenue filed declarations where they said that they don't infringe our claims because they manually transfer the information from one application, from the credentialing application into the medical malpractice insurance application. That declaration went on to say that they did that manually because they think it's more efficient. So if we ask ourselves, under ultra-martial, have we preempted all practical uses of the abstract idea, the answer has to be no. We are on the record, Your Honor, saying that if they manually transfer information from a credentialing application into a medical malpractice insurance application, they do not infringe our claims. And the fact that they've said that it's not merely more efficient I think is also relevant to our analysis on the machine test. Right, but it's not clear at any rate from Methius that preemption is the only inquiry. It talks about preemption, but it also talks about what is that trio of words, well-understood conventional routine. Why isn't what's going on here that the abstract idea is the collecting and transferring of information relevant to deciding how to define an intangible, namely a legal obligation. There are a couple of ways to transfer, electronically or not. Your broadest claims say electronically. Only one claim even says a computer or a computer network, and that doesn't further define it. And then this is just limiting that idea to a field of use. Your Honor, I don't agree that this is a mere field of use limitation. We do not, and by the way, I think you properly construed the abstract idea just as the district court did, to be recycling information for a different purpose. In this instance, we don't limit that abstract idea just to the field of credentialing. You can take information in a credentialing application and use it for a myriad of different reasons, to apply for a home loan, to get membership at the country club. The only use of credentialing information that we preempt with our patent claims is taking that information and transferring it to a medical malpractice insurance application. And then, Your Honor, I think just as in the Supreme Court's decision in Deere, only when that is practiced in conjunction with all of the other process steps, which here require electronic transfer, which we don't say computer, Your Honor, but it's plain for reading the specification. Do you wish to save any rebuttal? I do, Your Honor. Okay, thank you, Mr. Black. Mr. Kenney. May it please the court. The background of why we're here, I think, fits with the question of is there something more here. This case didn't come up on summary judgment, as many of the cases do, not all of them. It came up on motion to dismiss because we decided that it is the one that is the outlier. It fits in the territory where a motion to dismiss was appropriate, and there's a good policy reason for 101 to stand with some of the fact. Because in this case, and there's a perfect example of it in the record, there were 20 subpoenas issued. In this case, while this was pending on motion to dismiss, the court ultimately set those aside and ruled and did not allow this to take place. But that expensive kind of discovery was the next step, which this motion to dismiss was filed in order to avoid for not only the client. I represent a client that writes and helps obtain and brokers medical malpractice insurance in the state of Oklahoma, a relatively small business. That's what the motion to dismiss was filed for, was in an effort to avoid the expense of all that discovery and marking and hearing and all those other things. And the trial court agreed, and it obviously saved the trial court the amount of time required for that as well. So that's part and parcel of why we're here. We looked at this as one of the ones that clearly fit in that category, and clearly is the right word. I don't know. But where do you get the notion that I think Judge Dyke referred to and asked about that the content of credentialing information, even before this, was in fact gathered by medical malpractice insurance? That is in the record. I believe that that's part and parcel or inherent in the patent application itself. The application describes that that information has to be part of both the credentialing application. Do you happen to have where? The other place that's in this affidavit that I felt shouldn't have been in the record in the first place, but it was put in and we didn't object to it, where it says that's how we do this process and that's how we have done it. So in the patent itself, what it describes is the invention pertains to the order of process of linking an information database with an insurance application, and more particularly to the process of linking credentialing information with a medical malpractice insurance application. It implies that that's the only thing here is the computer or the electronic linking. Well, I think what they're saying is that the credentialing information was online, it was available online, but that there hadn't been before the idea of transferring that credentialing information to the insurance company. It talks about transferring it to hospitals, to other people, but I guess the idea is that they thought of the idea of transferring the credentialing information directly to the insurance company rather than first to the physician and then to the insurance company. That's sort of what I understand what they're saying. I think that's what they are saying. I think a fair reading of the patent application does not support that, and pure logic doesn't. In that there was credentialing information, that same information previous to this patent application had to go into the insurance application. They've acknowledged that both those kinds of information were essentially the same, and what they're saying is we seek to electronically link those. Anything further, Mr. Kennedy? I would like to point out two or three things. The patent application takes care of several things. The method, it says, can be practiced manually, partially electronically or electronically. They're seeking, and they say, both are incorporated herein by reference to the preferred documents. That's column 5, lines 13 through 28. And then the next specific is that the invention is specifically not limited to the medical malpractice industry but applies to any insurance application. That's at column 5, lines 28 through 31 and 40 through 45. The effort with this patent application is to broadly cover everything. Claims we have issued have simply been limited by one step, which is just to a medical malpractice policy. Sinclair purports to propose a new test. What are your thoughts on its test for 101? I didn't – no, I'm not sure I even understood it exactly, but I didn't see that it really advanced the ball. You boil this down to what is it that we're trying to do here? Are we trying – we're trying to look on the face of things and decide is there an invention? Is there something that meets that statute? Is it new and useful? How do you do that without prior art? Well, you don't want to get into the 102, 103 application, but you have to. Well, how do you decide if you've got an invention without checking the prior art? Is this new and – the statute says is it new and useful. And on its face, I would submit that the only thing we have here is the transfer by computer, which the court has said. And by looking at the exception, is there anything added to that, to the abstract idea? No. In our view, in this set of facts, all we've got is some data and some data, and we're transferring what we want to do. It's always – that's the solution that this patent brings to the table, and that's not enough. In our view, that's not – my view is that's in my gut. That's just clearly not an invention, and there's no reason to go further. Thank you, Mr. McKinney. Mr. Webb, you have the minute. Here's just a couple quick points. With regard to the new test, I would concede that I might have written a much different brief if I had the decisions in CLS and Ultramershal before me at the time. And I would just submit ourselves fully to the three-part test elaborated at Prometheus based on CLS and Ultramershal's further clarification on how we ought to apply the inventive concept. I know that we're not entirely clear what that means as a genuine human contribution. It's something that's not inherent. But I would say if we apply the Ultramershal test, we're willing to submit ourselves to that today, unless you think that's a workable solution to non-formula abstract ideas. A couple final points. One is that I don't think it's implicit in the patent that there was sharing between these two types of processes when the application was filed. This court is bound by the statements. They have to assume that they are true and view them in the light that's most favorable to me. The patent says, and I'll read from it here, there is currently in the art no known connection between the credentialing services, the credentialing information, and the insurance industry. For these reasons, Your Honor, based on subsequent developments on Ultramershal, I think this case has to be remanded at minimum for some fact discovery so we can have a full claim analysis. Of course, we think there's enough that you can conclude it passes muster under 101. And that's what we ask that you rule today. Thank you, Your Honor. Thank you, Mr. Webb.